UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A.G. ON BEHALF OF HERSELF AND HER
MINOR CHILD, K.P.,

                                               Plaintiffs,

                   vs.

NEW YORK CITY DEPARTMENT OF
EDUCATION; NEW YORK CITY BOARD OF
EDUCATION; CHANCELLOR RICHARD
CARRANZA, IN HIS OFFICIAL CAPACITY,

                                      Defendants.

Civ. No. 19-cv- 4862

**COMPLAINT**

## PRELIMINARY STATEMENT

1.  This Complaint is being filed on behalf of A.G. and K.P. (collectively, "Plaintiffs"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.,* the Due Process Clause of the 14th Amendment of the U.S. Constitution, 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), the New York State Constitution, New York State Education Law §§ 3202, 3203, and 4401 *et. seq.*, and the regulations promulgated thereunder.

2.  Defendants are the New York City Department of Education ("DOE"), the Chancellor of the New York City School District and the Board of Education ("BOE").

3.  K.P. is entering 9th grade.  She has been diagnosed with Selective Mutism, as well as other disabilities.

4.  Selective Mutism is considered a category of Anxiety Disorder pursuant to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5").

5.  According to the Selective Mutism Association, Selective Mutism "is best understood as a childhood anxiety disorder characterized by a child or adolescent's inability to speak in one or more social settings (e.g., at school, in public places, with adults) despite being able to speak comfortably in other settings (e.g., at home with family)."

6.  According to the American Speech Language Hearing Associate ("ASHA"), the incidence of Selective Mutism in the population is difficult to ascertain due to the "elative rarity of the condition, differences in sampled populations, variations in diagnostic procedures (e.g., chart review, standardized assessment), and the use of different diagnostic criteria."

7.  K.P.'s Selective Mutism was originally misidentified by the Defendants as autism.  However, due to the Parents' efforts in obtaining private assessments, for several years, the Defendants have been well aware of K.P.'s diagnosis of Selective Mutism

8.  However, Defendants have repeatedly advised Plaintiff A.G. that Defendants do not have services for children diagnosed with Selective Mutism and similar anxiety disorders.

9.  Due to the Defendants' ongoing failure to address her needs, K.P.'s Selective Mutism symptoms worsened and she regressed over the past four years.

10. In elementary school, K.P. whispered selectively in school.

11. During the 2016-2017 SY, K.P. – her 6th grade school year – she stopped speaking in class.

12. She had virtually no speech in school during her entire middle school years.

13. Further, none of her academic delays were addressed.

14. K.P. and her mother, A.G., have already pursued administrative relief under the IDEA by filing a Due Process Complaint ("DPC") with the Defendant, New York City Department of Education ("DOE") seeking an impartial hearing concerning the 2015-2016, 2016-2017 and 2017-2018 school years ("SYs")  (collectively "SYs at Issue").

15. A.G. also attempted to exhaust systemic claims, although administrative officers have no jurisdiction over those claims.

16. The Impartial Hearing Officer ("IHO") presiding over that case issued his Findings of Fact and Decision ("FOFD") on January 4, 2019 ruling for Plaintiffs on several issues, denying relief on other issues and dismissing some claims.

17. The IHO found that Defendant DOE denied K.P. a Free Appropriate Public Education ("FAPE") under the IDEA for the SYs at Issue.

18. A.G. pursued a partial administrative appeal to the New York State Review Officer ("SRO"), the second tier of administrative relief under the IDEA.

19. The SRO issued a decision on May 25, 2019.

20. This complaint appeals adverse rulings and failures to rule of the IHO and SRO and also raises systemic claims.

## PARTIES

21. K.P. ("Plaintiff K.P.") was a "child with a disability" under the IDEA.

22. K.P. is a qualified individual with a disability under Section 504.

23. A.G. ("Plaintiff A.G.") is K.P.'s mother.

24. A.G. is also a qualified individual with a disability pursuant to Section 504.

25.  Together the above-named plaintiffs will be referred to as "Plaintiffs."

26. K.P. and A.G. live together in Staten Island, New York.

27. RICHARD CARRANZA is the Chancellor of the New York City School District ("the Chancellor") and, as such, is entrusted with the specific powers and duties set forth in N.Y. EDUC. LAW § 2590-h.

28. THE NEW YORK CITY BOARD OF EDUCATION (the "Board of Education" or "Board"), was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York.  It is a recipient of federal financial assistance.

29. Upon information and belief, THE NEW YORK CITY DEPARTMENT OF EDUCATION (the "Department"), claims to be and appears to have been delegated the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  It is not clear that the Department is a legally formed independent entity, although it appears in lawsuits and claims to be a "municipal" corporation. It is a recipient of federal financial assistance.

30. Collectively, the Chancellor, Board, and Department are being referred to as the Defendants or the "DOE".

31. Under New York State law, the Committee on Special Education ("CSE") and the Subcommittees on Special Education ("SBSTs") are responsible for developing Individualized Education Programs ("IEPs").

32. Under the IDEA, it is the Local Educational Agency ("LEA") that is responsible for providing a Free Appropriate Public Education ("FAPE") to students with disabilities.

33. Defendants individually and/or collectively form the LEA.

## JURISDICTION AND VENUE

34. This Court has jurisdiction under 28 U.S.C. § 1331 in that claims are asserted under the laws of the United States, specifically 28 U.S.C. § 1343(a), 20 U.S.C. §1400, *et seq.,* 42 U.S.C. § 1983, 42 U.S.C. § 1988\; 29 U.S.C. § 794*, et seq*., and 20 U.S.C. §§ 2201 and 2202.

35. This Court has jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367.

36.  Venue is proper under 28 U.S.C. § 1391(b).

## LEGAL FRAMEWORK

37. The IDEA guarantees that all eligible children with disabilities, ages three through twenty-one, must be offered a FAPE.  20 U.S.C. § 1412(a) (1).  A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d) (1) (A)-(B).

38. A FAPE must "include an appropriate . . . secondary school education in the State involved"; and (d) be provided in conformity with an IEP.  *See* 20 U.S.C. §§ 1401(9), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

39. To be entitled to a FAPE, a child must have one or more of thirteen disabling conditions and, by reason of his/him disability, require "special education" and "related services." 34 C.F.R. § 300.8(a)(1).  Plaintiff has been classified by Defendants with various disabling conditions.

40. Defendants are responsible for providing a FAPE to all eligible children in New York City and for promulgating policies and procedures in accordance with the IDEA.

41. Every child with the designated disability classifications is entitled to an  Individualized Education Program, or "IEP"  and the LEA (here, Defendants) must provide an IEP which must be individually tailored to each student and is meant to serve as a blueprint for each child's special education services.  20 U.S.C. § 1414(d).  As mentioned, Defendants are the LEA in this case.

42. By the beginning of each school year, City Defendants must have an IEP in place that offers a FAPE to each eligible child.  20 U.S.C. § 1414(d)(2).

43. Before an IEP can be developed, a child must be evaluated in accordance with detailed procedures outlined in federal and state law.  20 U.S.C. §1 414, 34 C.F.R. §§ 300.15, 300.303-300.311, 8 N.Y.C.R.R. § 200.4.  A child is reevaluated in accordance with the same standards at least once every three years, or more frequently if a parent or school district believes it is necessary.

44. Among other things, an IEP must be developed by a properly constituted IEP team that includes particular members, including the parent and a district representative who is knowledgeable about the services and able to commit district resources.  20 U.S.C. § 1414(d)(1)(B).  In addition to the IEP team, New York State Law has created Committees on Special Education ("CSEs") and School Based Support Teams ("SBSTs"), which have differing levels of decision-making power. N.Y. Educ. Law § 4410; 8 N.Y.C.R.R. § 200.3(a)(1).

45. The IEP team must meet at least annually, and more frequently, if necessary, to modify a child's services and/or to address "[a] lack of expected progress toward the annual goals and in the general education curriculum."  20 U.S.C. § 1414(d)(4)(A)(ii)(I).

46. The IDEA broadly defines the categories of services that must be offered, which include, but are not limited to, special education, related services, supplementary aids and services, transition services, assistive technology ("AT"), and positive behavioral supports and services (collectively "Special Education Services").

47. The IDEA prescribes, in detail, the process for developing IEPs and their contents.  20 U.S.C. § 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3); 300.324; N.Y. Educ. Law § 4401, *et seq.;* and 8 N.Y.C.R.R.§ 200.4(d)(2)(iii)

48. For example, all IEPs must contain the results of a child's most recent evaluations, as well as an accurate and consistent description of his/him strengths and present levels of academic

achievement and functional performance (called "Present Levels of Performance" or "PLPs").  20 U.S.C.  § 1414(d)(1)(A).

49. An IEP must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modification or supports for school personnel that will be provided for the child."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).

50. Each IEP must also contain research-based instructional strategies unless they are not feasible, including positive behavioral interventions and supports for children whose behavior impedes their learning and/or that of others. 34 C.F.R. §§ 300.320(a)(4), 300.324(a)(2)(i); 8 N.Y.C.R.R. §§ 200.4(d)(2)(v)(b), 200.4(d)(3)(i).

51. An IEP team must also consider whether a student would benefit from assistive technology ("AT.")  34 C.F.R. §§ 300.5, 300.6, 300.105, 300.324(a)(2)(v).

52. A IEP and a child's placement must sufficient to enable a child the opportunity to make progress in accordance with the general curriculum, as well as functional progress in non-academic areas.

**The IDEA's Due Process Procedures**

53. One of the IDEA's most well-known due process rights is the right to request an impartial hearing "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child.  20 U.S.C. § 1415(b)(6)(A).

54. Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State Educational Agency ("SEA")] or by the Local Education Agency ("LEA") as determined by State law or by the [SEA]."  20 U.S.C. § 1415(f)(1)(A).

55. The IDEA sets forth detailed requirements for hearing procedures and IHO qualifications.  20 U.S.C. §1415(f); 34 C.F.R. §§ 300.511-516.

56. Among other things, an IHO shall not be an employee of the SEA or LEA, and cannot have a personal or professional interest that conflict with the IHO's objectivity.  20 U.S.C. § 1415(f)(3)(A).

57. IHOs must also be knowledgeable about the applicable laws, and be able to preside over hearings and write decisions in a manner consistent with generally acceptable legal standards.  *Id.*

58. In 2004, the standard for an IHO's decision-making was amended to require a decision on "substantive grounds based on a determination of whether the child received" a FAPE.  20 U.S.C. § 1415(f)(3)(E)(i).  Further, "[i]n matters alleging a procedural violation," an IHO may find a child did not receive a FAPE if the procedural inadequacies "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a [FAPE]," or "caused a deprivation of  educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii)(I-III).

59. In a two-tiered administrative system, "any party aggrieved by the findings and decision rendered [by the LEA] may appeal such findings and decision to the [SEA]."  20 U.S.C. § 415(g)(1). The SEA "shall conduct an impartial review of the findings and decision appealed."  20 U.S.C. §1415(g)(2).

60. New York is one of only a handful of remaining states that employ the above-referenced two-tiered due process system.

61. In New York City, City Defendants are responsible for ensuring that impartial hearings comport with the IDEA's requirements. Appeals from IHOs' decisions are heard by the State Review Officer (""), an employee of and lawyer for the New York State Education Department ("NYSED").  N.Y. Educ. Law § 4404.

62. Although the IDEA suggests that the SEA is the reviewing party, several federal courts have held that the SRO cannot be an employee of the SEA.

63. Defendants have promulgated various regulations and policies and engaged in practices with respect to due process that violate the IDEA and impermissibly restrict IHO's discretion and qualifications.

## INDIVIDUAL FACTS

64. The facts leading up to the filing of the administrative impartial hearing are set forth in the DPC filed by A.G. on June 30, 2017. A redacted copy of the DPC is attached hereto as Exhibit A. The allegations set forth in Exhibit A are incorporated herein by reference.

65. As noted above, K.P. has Selective Mutism ("Selective Mutism"), as well as generalized anxiety, depression, a Central Auditory Processing Disorder ("CAPD"), and sensory processing and fine motor delay

66. As noted above, Selective Mutism is considered a category of Anxiety Disorder.

67. Pursuant to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSelective Mutism-5"), the criteria for Selective Mutism are as follows: (a) "a child shows consistent failure to speak in specific social situations in which there is an expectation for speaking (e.g., at school), despite speaking in other situations"; (b) "[t]he disturbance interferes with educational or occupational achievement or with social communication"; (c) "the duration of the disturbance is at least 1 month"; (d) "the failure to speak is not attributable to a lack of knowledge of, or comfort with, the spoken language required in the social situation,"; and (e) "he disturbance is not better explained by a communication disorder (e.g., child-onset fluency disorder) and does not occur exclusively during the course of autism spectrum disorder, schizophrenia, or another psychotic disorder."

68. Children with Selective Mutism often present with social anxiety and social phobia.  In addition, children with Selective Mutism often avoid initiating social interactions and conversation.  If they have the ability to express themselves, they often rely on whispering, pointing and/or gesturing.

69. One of the unique features of Selective Mutism is that it is "selective," which means that children with Selective Mutism may often speak and interact in a typical way in their home setting or other environments in which they are comfortable

70. K.P. speaks at home fluently, to herself and to her sister, just like a typical child. K.P. will sometimes speak to A.G. in public (or whisper or text her even if they are together). However, she does not speak with other relatives

71. K.P. texts A.G. multiple times per day and will occasionally text with her father and speech therapist

72. The key allegations of A.G.'s DPC included claims that the Defendant DOE: (a) misidentified K.P. as having autism; (b) ignored A.G.'s repeated requests over the course of *three years* to add services to address K.P.'s functional, social, communication, emotional and academic delays; (c) failed to address K.P.'s Selective Mutism, which caused her to regress to the point where she is not speaking in school at all; (d) admitted that there is now a significant gap between K.P.'s IQ score (average) and her academic achievement in several areas, which are delayed between one and four years; and (e) committed gross and numerous procedural violations in evaluating K.P. and preparing IEPs, including refusing the provision of services based on availability.

73. The DOE bore the burden of proof and production on questions of FAPE, facts at issue, liability, and even remedy at the hearing.

74. To the extent that the Defendant DOE failed to address any of the allegations of the DPC at the hearing, the facts in the DPC should be deemed admitted.

75. At the hearing, the DOE also failed to establish that it satisfied any of the following substantive and procedural requirements of the IDEA.

76. Further, the DPC alleged that the DOE predetermined outcomes of IEP meetings by making decisions based on policies and resource availability.

77. The DPC also challenged various systemic policies and practices, including but not limited to the Defendants' failure to have services and programs for children who have Selective Mutism.

78. The IEP prepared for K.P.'s 2015-2016 SY was created as a result of a June 11, 2015 IEP meeting held in the 2014-2015 SY (the "June 2015 IEP") by the team at her elementary school in Staten Island.   K.P. attended that school up until fifth grade.

79. She was diagnosed with Selective Mutism in second grade by Dr. Adrianne Horowitz, an outside therapist, after A.G. was advised by her teachers that K.P. was not speaking actively and socializing.

80. In 2014, the DOE's psychologist erroneously diagnosed K.P. with Autism.

81. K.P.'s June 2015 IEP erroneously misclassified her with Autism.

82. The June 2015 IEP recommended integrated co-teaching ("ICT") for three subjects (ELA, Math and Social Studies), a .8 health paraprofessional, occupational therapy ("OT") twice per week for thirty minutes, speech and language therapy ("SLT") three times per week for thirty minutes as well as monthly Parent Counseling and Training ("PCT") "in and out of school."

83. The Defendants did not implement this IEP.

84. The IEP also recommended 12- month, ESY services of special education teacher suppoer services ("SETSS") five hours per week, OT and SLT.

85. The DOE ignored recommendations that it had in a 2013 report from an audiologist that were later memorialized in a 2016 report.

86. The IHO erroneously denied admission of the 2013 report.

87.  The June 2015 IEP notes that K.P. "is below grade level in all academic subjects" and that she scored a Level 2 in ELA and Level 1 in math for her 3rd grade assessments.

88.   More specifically, the IEP notes that she has considerable delays including delays in vocabulary, poor speech intelligibility, refusal to speak, inability to initiate conversation with peers and teachers, the need for *constant prompting* and redirection.

89. The June 2015 IEP also notes that K.P. will not contribute it either a small group or class setting and works best  on her own or 1:1 with a teacher.

90. The June 2015 IEP also noted that K.P. has body awareness, motor planning and coordination issues, as well as hand weakness and fine motor delays.

91. The IEP included only a handful of goals, that had no benchmarks, clear targets or grade-level alignment.

92. Further, the IEP did not contemplate that K.P. would achieve grade level standards in one year; rather, the DOE proffered services with the limited goal of K.P.'s satisfaction of only 25% of the 5th grade ELA and Math criteria.

93. The IEP notes in several places that A.G. is concerned with her lack of progress but none of her concerns were addressed.

94. During the summer of 2015, K.P. received SETSS via a P-4 and OT and SLT as per a related service authorization ("RSA").

95. As the DOE did not offer K.P. any Selective Mutism services, A.G. enrolled K.P. at "Camp Courage" a therapeutic program run by NYU at her own expense.

96. K.P. started fifth grade at her elementary school in September 2015.

97. K.P. received her OT and SLT after school via RSA.

98. K.P.'s fifth grade teacher, K.E., testified that she had no experience in working with children with Selective Mutism or anxiety. K.E. testified that K.P.'s IEP called for a "health paraprofessional" for autism," but that the paraprofessional was actually provided for "socialization" to help K.P. to "rehearse" what she would say, and watch her at lunch to make sure no one was bothering or bullying her.

99. The DOE did not establish that the paraprofessional had any training.

100. K.E. admitted that the paraprofessional did not help K.P. to socialize or communicate.

101. The DOE conducted a partial reevaluation in November 2015, which A.G. challenged and the DOE did not defend.

102. The reevaluation consisted only of a partial psychoeducational evaluation conducted on November 5, 2015 by the DOE's psychologist who erroneously diagnosed K.P. with Autism.

103. During the testing, K.P. "responded to the evaluator with one- or two-word phrases, in a barely audible whisper." Notwithstanding the clear improper administration of the test, K.P. showed delays in math and listening; she was not tested for writing.

104. K.E. testified that a November 2015 IEP meeting was held because A.G. wanted to add SETSS to the IEP during the 10-month school year.

105. . The attendees at the meeting were K.E., the general education teacher, and the psychologist.

106. Despite a lack of progress, the November 2015 IEP recommended the same services as the June 2015 IEP, with the addition of two one-hour staff training sessions in Selective Mutism

107. At the hearing, K.E. made significant admissions of gross substantive and procedural

violations in relation to the development of the IEP, including but not limited to the fact that the IEP team did not review any evaluations or prior IEPs and the DOE's school psychologist unilaterally wrote the IEP and made the decisions about the services and programs.

108.    The November 2015 IEP repeats the information on the June 2015 concerning K.P.'s failure to speak, need for prompting, academic and social delays.

109.    Further, the November 2015 IEP listed K.P.'s spring 2015 test scores of Level 1 on the 2015 math exam and Level 2 in the 2015 ELA.

110.    The IEP itself also refers to an independent OT evaluation that A.G. provided which showed that K.P. has decreased sensory processing, postural control deficits, delays in gross and fine motor skills, as well as delays in bilateral coordination to attend and focus as well as decreased registration of sensory input which limits her ability to acquire new skills.

111.    The November 2015 also notes A.G.'s concerns with K.P.'s lack of social skills, writing, hand fatigue, math and expressive language development and a request for ("AT").  K.E. admitted that A.G. reiterated her concerns about K.P.'s academic progress and the fact that she was speaking at home but not in school.  K.E. claimed that SETSS was denied because the school had "proof that K.P. was making progress at the time."

112.    The November 2015 IEP both lists K.P.'s math skills to be below grade level and continues the reduced promotional criteria for K.P. The DOE proposed 45% of 5th grade ELA standards and 25% of the 5th grade math standards.

113.    The DOE staff told A.G. that her request for K.P. to have SETSS was denied because under DOE's policy, SETSS could not be recommended along with ICT as it would be "double dipping."

114.    In fact, in general, DOE's IEP teams cannot recommend SETSS in connection with ICT or

any other program.

115.    The DOE's psychologist tried to encourage A.G. to move K.P. to a segregated program for children with Autism, but after visiting the program A.G. declined, as K.P. appeared to be higher functioning, particularly at home, where she does not display that same fears and anxieties about socializing. At that time, A.G. was unaware of the DOE's error relative to K.P.'s classification of autism.

116.    During 5th grade, K.P. was still whispering in school on occasion.

117.    A.G. paid Dr. Horowitz, a therapist, for counseling for K.P.

118.    K.E. testified that she would sometimes observe K.P. reading out loud to her partner during structured reading or speaking a prompted sentence during a seminar.

119.    In the spring of 2016, K.P. was bullied by a child in the school during lunchtime, at recess, and in the hallways.

120.     A.G. reported the bullying but was told that the school could not take any action because the child denied it; instead, the school removed K.P. from the other children during the free period.

121.    A.G. visited various middle schools in spring of 2016 to prepare for K.P.'s transition in the fall of 2016.

122.    She applied to the public middle school that K.P. ultimately attended because it was much smaller than her zoned school of 1100 students, had a stated philosophy of tolerance and cooperation, and the girl who bullied K.P. was going to be at the zoned school.

123.    A.G. actively tried to meet with C.D., the principal of the middle school in spring of 2016; she brought information about Selective Mutism and asked for Dr. K. to train the staff before school started.

124.    C.D. declined. A

125.    After C.D. met with A.G., the DOE never offered any other program or placement for the 2016-2017 school year.

126.    In the spring of 2016, A.G. had K.P. assessed through the Healthy Brain Network ("HBN").  HBN concluded that K.P. required further testing to assess for Autism.

127.    A.G. provided this report to the DOE, but the DOE did not conduct follow-up testing.

128.    For her summer 2016 services, K.P. had her RSA-funded OT and SLT and SETSS.

129.    In addition, in August 2016, A.G. arranged for K.P. to be assessed by the Smart Center at her own expense.

130.    The Smart Center determined that K.P. did not have autism.

131.    A.G. provided the Smart Center report to the DOE.

132.    K.P. started sixth grade at her public middle school in September 2016.

133.    An expert in the area of Selective Mutism from NYU trained the school staff in late September 2016.  The expert recommended that teachers keep a daily log about K.P.'s communication; the DOE never implemented this log although C.D. told A.G. it would do so.

134.    When K.P. first started 6th grade, she was still whispering a bit in class.

135.    K.P.'s 6th grade teacher ("L.D.") testified that during the fall of 2016, K.P. did not often speak except to advise her paraprofessional that she had to use the restroom and that the paraprofessional generally worked with other students in the classroom.

136.    By the fall parent teacher conference, the teachers told A.G. that K.P. needed help with academics, and that her comprehension was poor, her math was delayed, and she was not handing in her assignments. Yet, the DOE did not offer her any additional services or supports.

137.    At the hearing, the DOE's presentation of IEPs for the 2016-2017 SY was not cohesive.

138.    The DOE did not prepare any other IEP for K.P.'s transition to middle school or establish

that it offered any placement to K.P. that was specific to her individual needs. For those reasons alone, the IHO should find that FAPE was denied.

139.    Subsequently, there were apparently three IEP meetings in 2016-2017: (i) an October 2016 "annual review" which included, at least, the parent, C.D. and L.D.; (ii) an IEP meeting with only the Parent and the school psychologist, held on the day after the October annual review; and (iii) a ten minute November 2016 meeting (held without the Parent) which was attended by the psychologist, another teacher and L.D.

140.    The DOE chose not to include the October 2016 IEP or the IEP created by L.D. the day afterward as evidence, electing instead to include the November 2016 IEP resulting from the meeting held without A.G.

141.    The DOE included the Prior Written Notice for the October 2016 IEP meeting in evidence, which memorializes some of the changes made.

142.    The DOE did not establish that there was ever an IEP meeting held in November 2016. The school psychologist testified that A.G. and the school psychologist talked for ten minutes. However, L.D. testified that she was alone on the phone with the psychologist.

143.    Beyond the failure to produce IEPs relative to two of the meetings and the exclusion of A.G. from the third meeting in November, the evidence further established additional gross procedural violations demonstrating that the DOE terminated services, failed to review evaluations, wrote the IEP without A.G.'s involvement, made wholly unilateral decisions about services based on policies and availabilities, failed to convene appropriate team meetings, and declined to afford K.P. an "FM Unit" that the audiologist recommended that she use due to her processing disorder.

144.    The DOE's employees admitted at the hearing that they were not permitted to recommend after-school services, tutoring, after-school SETSS, or any Selective Mutism services as the DOE does

not have such services available to provide through an IEP.

145.    The November 2016 IEP did not recommend the paraprofessional, PCT and SETSS for the ESY program, Selective Mutism services or 1:1 instruction or remediation

146.    Instead, despite K.P.'s declining performance, the IEP recommended ICT for 25 periods per week in ELA, Math and Social Studies (no electives), continued the OT and SLT via RSA during the year, as well as in the summer.

147.    The November 2016 IEP continues to note that K.P. is not working at grade level, in that she has 4th grade math skills and 5th grade reading skills and in the spring of 2016 (the end of her 5th grade year), K.P. scored a 1 on the ELA and math exams.

148.    The IEP continues to fail to include a grade level for writing. Further, the November 2016 IEP continued the trend of proposing promotion standards following K.P.'s mastery of only a fraction of the curriculum presented for her grade (45% of the ELA criteria and 25% of the math criteria).

149.    In comparison, general education students would have to master 60 to 70% of the curriculum to demonstrate mastery for purposes of promotion.

150.    The team did not recommend counseling or social skills (which are not offered at the school).

151.    A.G. testified that she participated in a student-led conference with K.P. in the fall of 2016. When she got up to speak, K.P. froze and started to cry; she had to complete the task by whispering in her mother's year.

152.    On one occasion during the 2016-2017 SY, the DOE allowed K.P. to record a presentation for the class.

153.    In January 2017, K.P. started to receive services from Kurtz Consulting which were funded by A.G.  Dr. Kurtz and his staff are experts in Selective Mutism.

154.    A doctor from Kurtz Consulting wrote a letter for A.G. outlining the services that K.P. required.  A.G. provided this letter to the Defendants, who ignored it.

155.    Defendants held another IEP meeting in March 2017 and thereafter issued the March 2017 IEP.

156.    The March 2017 IEP recommended all the same services as the November 2016 IEP, except for the addition of: (a) the FM unit; (b) return of summer SETSS (5x60); and (c) two hours per year of staff training in Selective Mutism

157.    K.P.'s promotional criteria continued to be below grade level, at 45 % of ELA and 31 % of math standards.

158.    Like the IEPs before it, the DOE committed gross substantive and procedural violations, including but limited to applying blanket policies and practices, making decision based on the lack of availability of services, failing to offer tutoring or Selective Mutism services, failing to include A.G. in the development of the IEP and failing to provide her any additional services or supports or goals relating to her various disabilities.

159.    Again, the DOE admitted that it could not offer any Selective Mutism services because the Defendants do not have or offer any such services.

160.    Further, the school psychologist testified that if the team had determined that K.P. needed more support than the ICT could have provided, the team's only option would be recommend a segregated special education class.

161.    The DOE's staff assumed at the time of this meeting that K.P.'s Selective Mutism was the sole cause of her poor grades and scores on standardized assessments.

162.    The DOE's witness testified that since K.P. often failed to respond either verbally or in writing during class, it was difficult to ascertain her academic progress.

163.    Following this IEP meeting, A.G. tried to advocate with the district office and even the chancellor, but was unable to resolve the issues on her own. A.G. was told she had to produce medical documentation to the DOE for a paraprofessional to be restored.  After she did so, the DOE never held another IEP meeting to consider the updated information.

164.    A.G. also provided the DOE with a May 2017 letter from anther expert in Selective Mutism, but she never heard any response.

165.    After A.G. wrote to the then-Chancellor, a representative from the Defendants' district office contacted her to advise that the DOE does not offer Selective Mutism services and A.G. would have to fund them privately.

166.    As noted above, A.G. filed her DPC on June 30, 2017. Ex. A.

167.    K.P. should have had pendency in her last agreed upon services for ESY program. However, A.G. could not locate a SETSS provider over the summer and the DOE did not provide one.

168.    K.P. returned to her public school for 7th grade in September 2017.

169.    The DOE failed to pay NYU for training for 2016-2017 so NYU refused to return to train the staff.

170.    The DOE did not call any teacher to testify about K.P.'s progress during this year.

171.    The unrebutted evidence showed a significant regression.

172.    K.P. did not speak in school at all during the 2017-2018 school year.

173.    Further, K.P. was very upset and would frequently cry at home about her experiences in school.

174.    In May 2018, the school psychologist tried to assess K.P.   Notably, K.P. was unable to speak at all during the assessment.  The testing protocols used did not permit children to provide alternative responses.

175.    K.P.'s full scale IQ fell into the average range of 106, and her verbal comprehension and visual spatial scores were higher than average.   In contrast, K.P.'s working memory was low average, and she scored in the 2nd percentile ("very low") on the picture span subtest. In contrast, K.P.'s comprehension scores were delayed by almost four years, her spelling skills were delayed by more than two years, and her calculation skills showed a delay of two years, while math facts were delayed by one year. She showed two skills above her age- level (applied math problems and sentence reading fluency).

176.    As K.P. was allowed to write the fluency portion of the test, the DOE's testing could not be accurate.

177.    The school psychologist admitted that, given K.P.'s IQ score, she should have been performing better in school.

178.    Further, the DOE issued a promotion in doubt letter for the 2017-2018 SY.

179.    .G. testified that she was unable to implement her SETSS services during the summer of 2018, although K.P. had pendency rights under the IDEA.

180.    During the 2018-2018 SY, K.P. remained in the exact same program with the exact same services that the IHO found denied her a FAPE in the prior school years.

181.    The school psychologist advised A.G. this year that she was not permitted to recommend a private school for K.P.

182.    During the 2018-2019 SY, K.P. experienced bulling at school.

183.    She regressed socially and emotionally during the 2018-2019 SY.

184.    At some point while the hearing was pending, the DOE tried to staff a paraprofessional for K.P.   However, the DOE failed to ensure that the paraprofessional was trained and she made inappropriate comments in front of K.P.   After A.G. expressed her concerns to the school about the

paraprofessional's comments, K.P. told A.G. that the paraprofessional would not interact with her.

185.    On January 4, 2019, the IHO issued his Findings of Fact and Decision ("FOFD") in which he found that the DOE had denied K.P. a FAPE for the SYs at Issue.

186.    A redacted copy of the FOFD is attached hereto as Exhibit B.

187.    The DOE The facts that were established at the hearing plainly demonstrated gross and extensive substantive and procedural violations of the IDEA.

188.    In the FOFD, among other things, the IHO ordered certain compensatory education, assessments and reimbursement.

189.    However, the compensatory education ordered was only available until the end of the 2018-2019 school year.

190.    Further, the relief that the IHO awarded – funding for a private school – was not available.

191.    The IHO ignored several of the claims raised and did not rule upon the Plaintiffs' Section 504 claims or systemic claims that were raised.

192.    The rulings of the IHO that were adverse to Plaintiffs constituted errors of law and abuse of discretion, and they were contrary to the record.

193.    The IHO's decision relative to compensatory education was poorly reasoned.

194.    The IHO did not order compensatory education sufficient to place K.P. in the position she would have been in had FAPE been denied for the three school years.

195.    After the IHO's decision, rather than allow an independent neuropsychological evaluation as ordered, the DOE insisted that K.P. be evaluated by a contracted psychologist on the DOE's approved list who does assessments at a much lower rate than the market rates generally charged for those services.

196.    Further, even though the IHO ordered the DOE to place K.P. in a private school for the 2018-2019 SY, the school was unavailable.

197.    Further, A.G. could not utilize the Selective Mutism assessment ordered by the IHO, because K.P. was leaving her school in June 2019 and any assessment conducted at the school would not be applicable to the following school year.

198.    Thus, even after the IHO issued his decision, K.P. languished in her current, admittedly inappropriate setting.

199.    In particular, in the spring 2019 semester, K.P.'s her emotional state was deteriorating and started to experience extreme anxiety during gym and recess.

200.    Although A.G. complained about the bullying and requested a reasonable accommodation for K.P., the Defendants would not address any of these issues and denied the reasonable accommodation request in violation of the law.

201.    Defendants would not allow any accommodations or modifications to K.P.'s schedule during the 2018-2019 SY.

202.    Following the issuance of the SRO Decision, Defendants arranged for K.P. to attend the Community School ("Community") a New York State-Approved Private School located one hour away from K.P.'s home in New Jersey.

203.    Community had accepted K.P. for the prior year, but had no seat available for her until September 2019.

204.    A.G. has tried to arrange for services to be funded as per the SRO order but she has run into roadblocks in terms of the logistics of being able to facilitate payment for training, assessment and services at Community.

205.    Absent an order, Community is restrained from allowing additional services funded by

Defendants to be provided on-site, as a result of state and local policies preventing individualization of services for children in state-approved private schools.

206.    Defendants did not implement K.P.s' IEPs during the SYs at Issue.

207.    Defendants have failed to implement K.P.'s stay-put rights as well as the FOFD and SRO Decision.

## THE SRO'S DECISION SHOULD BE PARTIALLY REVERSED

208.    Although Plaintiffs won at the hearing level, they were forced to appeal the IHO Decision as the award ordered was insufficient and not available.

209.    Plaintiffs filed their Request for Review ("RFR") with the SRO to appeal certain rulings and findings of the FOFD.

210.    Defendants did not cross-appeal.

211.    As noted above, the SRO issued a decision on May 25, 2019 ("SRO Decision"), with the case number of SRO No. 19-018.

212.    The SRO Decision reversed the IHO on certain grounds and granted additional relief.

213.    The SRO extended the relief awarded by the IHO to the 2019-2020 SY to enable K.P. to use the relief.

214.    The SRO awarded K.P. funding for a state-approved non-public school for the 2019-2020 SY.

215.    The SRO also awarded K.P. funding for one year of selective mutism services, which are to expire at the end of 2019-2020.

216.    The Plaintiffs are not appealing the favorable rulings of the SRO.

217.    However, the SRO did not award sufficient relief.

218.   All rulings of the SRO that were adverse to Plaintiffs are being appealed here, even if they are not specifically listed.

219.   As to all adverse rulings, the SRO's decision was an abuse of discretion, wrong as a matter of law, was in conflict with the record and was poorly reasoned.

220.   The SRO awarded only tuition of one year of private school and one year of Selective Mutism services.

221.   The record did not support the conclusion of the IHO or SRO that only one year of services would compensate K.P. for three years of significant deprivation.

222.   The IHO and SRO failed to award sufficient tutoring services.

223.   The record established that K.P. was significantly below grade level during the three years at issue.

224.   Further, the SRO awarded only one year of selective mutism services, even though K.P. had suffered a significant deprivation and there was no evidence in the record that a single year of services would be sufficient to compensate K.P. for the deprivation she suffered.

225.   Further, the Defendants failed to establish that they implemented K.P.'s IEPs and agreed upon services during the SYs at Issue.

226.   The SRO failed to award the student assistive technology ("AT") although she was entitled to AT as compensatory education.

227.   In fact, the Defendants have yet to pay New York University ("NYU") for trainings that NYU provided to K.P.'s school.

228.   The IHO and SRO ignored this issue when considering relief.

229.   The Defendants' delay in paying NYU is causing a delay in the Plaintiffs' ability to obtain training from NYU for K.P.'s new school.

230.    The Defendants failed to implement K.P.'s stay-put services under the IDEA.

231.    The IHO and SRO ignored this issue when considering relief.

232.    Further, the SRO ruled – *sue sponte* – without notice to the parties, that because the IHO ordered private school funding, A.G. could not assert that the Defendants had not offered a FAPE to K.P. for the 2019-2020 school year, awarding the Defendants a two-for-one discount on a FAPE denial.

233.    In addition the above, the SRO reversed aspects of the IHO's decision that were not appealed by either party.

234.    The IHO had ordered an Selective Mutism assessment at an hourly rate, which was capped at a rate lower than the rate supported by the record.

235.    The Plaintiffs appealed the rate cap, but did not appeal the minimum rate of $275 per hour.

236.    Defendants did not cross-appeal.

237.    The SRO capped the assessment at a lower amount than the rate for the assessment ordered by the IHO, despite the fact that Defendants did not appeal.

238.    The IDEA and basic principles of due process required that Plaintiffs should have been afforded the opportunity to rebut and/or address any defenses or objections upon which the SRO and IHO based their decisions through presentation of evidence and/or legal argument.

239.    The findings of the SRO (and the IHO) that were based on any defense and/or objection that Plaintiffs had no opportunity to rebut or address through documentary or witness testimony should be reversed.

240.    The findings of the SRO (and the IHO) that were not based on any defense and/or objection that Defendants raised at the hearing and/or appeal should be deemed waived and the rulings should be reversed.

241.    The SRO's ruling violates U.S. Supreme Court precedent as the Court has ruled that a FAPE must ensure both academic and functional progress, not just passage from grade to grade.

242.    The SRO's ruling remanding to the Defendants and offering Defendants the discretion to frame compensatory education violates A.G.'s due process rights as it gives Defendants discretion over the award.

243.    The SRO's ruling violates the persuasive authority from the U.S. Department of Education, which issued a policy guidance making clear that an IEP should "close the gap" for students like K.P. whose underlying skills in reading, math and writing are delayed relative to his grade.

**The SRO's Order Does Not Make K.P. Whole for the Deprivation that She Suffered**

244.    The Second Circuit has defined compensatory education to be a remedy for a denial of a FAPE that is "'calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.'"[1]

245.    The SRO's ruling is – as a matter of law and the record –inadequate and fails to comply with the generally accepted standards for a fact-specific analysis to craft a compensatory award.

246.    As to the analysis of the remedy, the SRO's decision is poorly reasoned and not based on the record.

**The SRO's Order Deprived K.P. of Her FAPE Entitlement for 2019-2020**

---

[1] *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 457 (2d Cir. 2015) (*quoting Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 524 (D.C. Cir. 2005)).

247.    The SRO violated K.P.'s rights to a FAPE by awarding compensatory education for the SYs at Issue as the exclusive services to which K.P. is entitled for her FAPE entitlement for the 2019-2020 school year (which has not yet been litigated or exhausted).

248.    Plaintiffs had no notice that such a restriction and/or condition would be placed on the compensatory education award and the deprivation of K.P.'s FAPE entitlement for the 2019-2020 SY based on the SRO's award, denied her rights under the IDEA as well as due process of law.

249.    The SRO had no legal authority (and indeed cited to no authority) upon which to *sua sponte* rule that K.P. would lose her FAPE entitlement for the 2019-2020 SY by requesting compensatory remedy for the SYs at Issue.

250.    Further, compensatory education is to compensate for services that the Defendants should have provided in a prior year – not remove a FAPE entitlement that a student may have in a future year.

251.    This is particularly egregious since K.P. should have been entitled to funding for a private school based on her FAPE entitlement for the 2019-2020 school year in any event.

252.    The SRO's ruling essentially gives Defendants an award for violating K.P.'s rights for four years and gives Defendants a perverse disincentive to follow the IDEA's mandates.

**DEFENDANTS FAILED TO ENSURE PROGRAMS, ACCOMMODATIONS AND SERVICES FOR CHILDREN WITH ANXIETY DISORDERS AND APPLY BLANKET POLICIES AND PRATICES**

253.    Defendants operate a limited menu of services for children with IEPs.

254.    There are a set menu of service options and many services are not permitted to be recommended in connection with each other.

255.    Defendants do not offer any specialized services or supports for children with Selective Mutism and other anxiety disorders in Staten Island.

256.   The only counseling services that Defendants offer are "guidance counseling" services on an IEP that require a child to be pulled out of class.

257.   Defendants do not offer after-school services to children with anxiety disorders.

258.   Defendants do not offer 1:1 tutoring or academic remediation during or after school.

259.   This is particularly egregious since K.P. should have been entitled to funding for a private school based on her FAPE entitlement for the 2019-2020 school year in any event.

260.   Defendants only have one state-approved private school in the entire borough of Staten Island and that school serves only children with autism who are cognitively impaired.

261.   Defendants' IEP teams are not

**DEFENDANTS FAILED TO ENSURE PROGRAMS, ACCOMODATIONS AND SERVICES FOR CHILDREN WITH AUDITORY PROCESSING DISORDER AND APPLY BLANKET POLICIES AND PRATICES**

262.   As alleged above, Defendants operate a limited menu of services for children with IEPs.

263.   As alleged above, there are a set menu of service options and many services are not permitted to be recommended in connection with each other.

264.   Other than pull-out or push-in speech therapy, Defendants do not offer or have available accommodations, remediation, services or supports for children with auditory processing disorder.

265.   Defendants do not operate or offer small, quiet inclusion classroom settings or classrooms for children with auditory processing disorders who can otherwise receive instruction in the least restrictive environment.

**DEFENDANTS DO NOT AFFORD
REASONABLE ACCOMMODATIONS TO
CHILDREN WITH IEPS WHO ATTEND PUBLIC SCHOOLS**

266. Defendants' IEP teams are not empowered to provide individualized reasonable accommodations to children with IEPs who are eligible for reasonable accommodations under the ADA.

267. Defendants' IEP teams are not empowered to provide individualized reasonable accommodations to children with IEPs who are eligible for reasonable accommodations under Section 504.

268. Defendants do not have any written policies, procedures, protocols or guidance concerning the manner in which children with IEPs are to be consider for and/or granted reasonable accommodations under either Section 504 or the ADA.

269. Defendants' IEP teams are constrained by the services that are available in their schools and constrained by predetermination based on availability of resources and policies concerning implementation of accommodations and special education services rather than federal law.

270. Throughout the years in question Plaintiffs were harmed by the Defendants' actions and inactions which failed to ensure that K.P.'s rights under these federal laws were protected.

**K.P. IS ENTITLED TO AN EXPANSIVE AND FLEXIBLE EQUITABLE AWARD**

271. K.P. suffered years of social isolation, deprivation of content and skills-based instruction, extra-curricular activities, and social bonding.

272. Many of the injuries suffered by K.P. were caused by gross failure to comply with clear federal and state mandates.

273. Further, K.P. continued to suffer from multiple violations of various laws even after A.G. filed for due process.

274.    K.P. is entitled to an equitable remedy for the extensive violations of her rights and the long-term denials of FAPE, academic deprivations, social isolation and bullying, and deprivation of FAPE.

275.    K.P. should be made whole and compensated for the long-term deprivation and damage that Defendants have caused and she should be restored to the position he would have been in, had Defendants not committed extensive FAPE violations and subjected her to discrimination based upon her disabilities.

276.    K.P. should also be awarded a compensatory education fund to allow her to obtain private remedial special education services, related services, evaluations, materials, AT, transition services, and additional supports.

277.    K.P. should be able to draw from the compensatory fund to obtain services available under the IDEA including, but not limited to, any educational or extracurricular service or support available under the IDEA or under state law for eligible children and should include but not be limited to:

  a.  Additional tutoring and remediation;

  b.  Selective Mutism Services, including specialized psychological counseling, social skills training, training for the staff, push-in therapeutic services, and any other required supports and services;

  c.  Services to address auditory processing, including non-stigmatizing technology for amplification of sound;

  d.  Speech and language therapy and other related services;

  e.  Additional services to address written and verbal communication delays;

  f.  Assistive technology;  and

       g.   Transportation;

278.    K.P. is entitled to compensatory damages for the multiple injuries that she suffered to educational opportunities, as well as emotional distress, segregation, and exclusion from the educational system.

279.    A.G. is entitled to reimbursement for ongoing out-of-pocket expenses.

### NO DEFERENCE IS DUE THE IHO OR SRO ON ADVERSE RULINGS

280.    The Court need not afford the rulings of the IHO and SRO deference.

281.    The Defendants did not cross-appeal the IHO's ruling on FAPE and therefore, the IHO's determination that FAPE was denied is final.

282.    No deference is due to either the SRO or IHO in relation to the compensatory award that was issued to K.P., which were grounded in equity.

283.    No deference is due to either the SRO or IHO in relation to any questions of law.

284.    Even to the extent that the SRO or IHO made any findings on educational policy, no deference would be due.

285.    Further, the SRO is not an expert in educational policy, and thus lacks the "institutional competence and role" to be given deference in this case. *See M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.,* 685 F.3d at 244.

286.    The SRO is a lawyer for and employee of the New York State Education Department ("NYSED") and, by definition, has a conflict of interest in light of the fact that the NYSED has a financial outcome in the due process hearings and appeals, as well as questions of policy and relief.

287.    Moreover, the SRO Decision cites to inapplicable case law (relating to tuition reimbursement), and cited to cases and/or SRO decisions for the incorrect propositions.

288.    Further, the SRO Decision made several findings of law that were not supported by either statute or cases, and generally contained little to no reasoning in support of the major findings.

289.    In addition, to extent the SRO failed to rule on many of the issues raised on appeal and failed to address Plaintiffs' position on waiver of defense and objections, no deference would be due.

290.    For all of the reasons alleged herein and in the appeal to the SRO, the IHO's decision is not entitled to deference.

**PLAINTIFFS ARE NOT REQUIRED TO**
**FURTHER EXHAUST ADMINISTRATIVE REMEDIES**

291.    A.G. has already exhausted her IDEA remedies.

292.    Plaintiffs should not have to exhaust their remedies for the 2018-2019 SY as the Defendants offered the same IEP and placement and the systemic claims raised are identical.

293.    Further, the record shows that the Defendants simply do not have the services that K.P. requires for a FAPE available through the IEP process.

294.    Plaintiffs are not required to further exhaust administrative remedies with respect to the claims filed under Section 504, the ADA and Section 1983, the U.S. Constitution or the New York Constitution.

295.    Neither the IHO nor SRO has jurisdiction under New York law to hear claims pursuant to the ADA and 42 U.S.C. § 1983, though these claims were raised.

296.    Neither the IHO nor SRO assumed jurisdiction of Plaintiffs' Section 504 claims.

297.    State law only vests the SRO and the IHO with authority over IDEA and New York Education law claims.

298.    The SRO does not have jurisdiction over systemic claims, or claims filed under Section 504, the ADA, Section 1983 or the U.S. and New York Constitutions.

299.    The IHO and SRO did not address or hear Section 504 issues, and did not assume jurisdiction over systemic claims, or claims filed under Section 504, the ADA or Section 1983.

300.    Exhaustion of claims is not necessary as Plaintiffs make systemic claims over which there is no jurisdiction.

301.    Further exhaustion is not required because Plaintiffs require discovery to prove claims alleged.

302.    The Plaintiffs did not receive adequate notice of their due process rights and, as such, were not required to exhaust their remedies in the first instance.

303.    Exhaustion is not required because Plaintiffs seek damages for the harm caused by extended school exclusion and educational deprivation as well as discrimination.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION -- DEFENDANTS VIOLATED THE IDEA

304.    Plaintiffs repeat and re-allege the allegations in all the above paragraphs as if fully set forth herein.

305.    Defendants denied FAPE to K.P. for the SYs at Issue as well as the 2018-2019 SY.

306.    Defendants failed to comply with any of the procedural requirements of the IDEA during the SYs at Issue.

307.    Defendants failed to evaluate K.P. in accordance with the IDEA.

308.    K.P. is entitled to additional compensatory education beyond the equitable relief that the SRO ordered.

309.    K.P. is entitled to a FAPE in 2019-2020, regardless of the award of compensatory education ordered by the SRO for the violations for the SYs at Issue.

### SECOND CAUSE OF ACTION -- DEFENDANTS VIOLATED SECTION 504

310.    Plaintiffs repeat and re-allege the allegations in all the above paragraphs as if fully set forth herein.

311.    Defendants receive federal financial assistance for their education programs.

312.    K.P. is a qualified individual with a disability under Section 504.

313.    Defendants discriminated against K.P. for all of the reasons set forth herein.

314.    Defendants denied K.P. reasonable accommodations.

315.    Defendants discriminated against K.P. under Section 504 by denying her virtually all of the procedural and substantive provisions of the IDEA and denying him a FAPE for multiple years.

316.    Defendants have treated K.P. unequally compared to students that do not have disabilities and have denied her an opportunity to participate in educational services that are afforded to others and that are as effective as those services offered to others.

317.    Defendants have discriminated and are discriminating against G.J. based on his disabilities pursuant to Section 504 by the adoption of policies, practices and procedures that have disparate impact of individuals with disabilities.

318.    Defendants discriminated and are discriminating against K.P. based on her disabilities pursuant to Section 504 of the Rehabilitation Act by (a) adopting, implementing, and applying policies and practices that contravene federal and state law with respect the development and implementation of IEPs, placements, programs and accommodations for children with disabilities; and (b) failing to adopt, implement and apply policies and practices to ensure the protection of their rights under such laws.

319.    Defendants discriminated against K.P. under Section 504 by adopting illegal blanket policies and applying them to K.P., which resulted in the development of his IEPs and placements.

320.     Defendants violated Plaintiffs' rights under Section 504 by adopting policies, procedures, and practices pursuant to which IEPs are developed and services are offered based on administrative concerns and students' classification, rather than students' individual needs.

321.     Defendants violated K.P.'s rights by

322.     Defendants violated K.P.'s rights by failing to provide her a FAPE and violating virtually every provision of the IDEA education for more than four years.

323.     Throughout the school years at issue, Defendants' conduct was gross, egregious, intentional and reckless.

## THIRD CAUSE OF ACTION -- 42 U.S.C. § 1983

324.     Plaintiffs repeat and re-allege the allegations in all the above paragraphs as if fully set forth herein.

325.     Defendants violated Plaintiffs' rights under Section 1983 by (a) adopting policies and procedures, (b) engaging in a widespread practice that constituted custom or usage, (c) failing to supervise and train their employees, and (d) failing to adopt appropriate policies and procedures with respect to children recommended for private school programs.

326.     Defendants violated Plaintiffs' rights under Section 1983 by their adoption of policies, procedures, and practices pursuant to which IEPs are developed based on administrative concerns, students' classification, and/or the availability of services and resources, rather than students' individual needs.

327.     Under color of state law, Defendants denied K.P. her right to educational services in New York without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution.

## FOURTH CAUSE OF ACTION – STATE LAW

328.    Plaintiffs repeat and re-allege the allegations in all the above paragraphs as if fully set forth herein.

329.    Defendants have violated Plaintiffs' rights under the New York State Constitution, New York State Education Law §§ 3202, 3203, 4401, 4404, and 4410 and the Regulations of the New York State Commissioner of Education, as well as 8 N.Y.C.R.R. §§ 100, 200.

## RELIEF

330.    Wherefore, Plaintiffs request that the Court:

    a. Issue a Declaratory Judgment in Plaintiffs' favor finding that Defendants violated Plaintiffs' rights as alleged herein;

    b. Issue a preliminary injunction enjoining Defendants from failing to enforce the final relief ordered by the IHO and SRO;

    c. Issue a final Order and Judgment:

        i. Upholding the rulings and findings in the IHO's decision which were issued in Plaintiffs' favor;

        ii. Reversing and vacating the rulings of the SRO and IHO that were adverse to Plaintiff;

        iii. Awarding additional equitable relief in the form of compensatory education and creating an escrow fund for the provision of compensatory education for K.P.;

        iv. Awarding independent Selective Mutism assessment, a neuropsychological evaluation, as well as other evaluations at enhanced rates;

    v.   Awarding additional equitable relief and reimbursement to A.G.;

d.   Awarding Plaintiffs costs and attorneys' fees; and

e.   Ordering such other relief as may be appropriate.


Dated:      August 25, 2019
              New York, New York


                            Respectfully submitted,
                            THE LAW OFFICE OF ELISA
                            HYMAN, P.C.

                                */s/ Elisa Hyman*
                            By_____
                            Elisa Hyman, Esq.
                            Attorneys for the Plaintiffs
                            1115 Broadway, 12th Floor
                            New York, NY 10010
                            646-572-9064
                            elisahyman@gmail.com